UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DEWUANE AVRIETT | No. 19 CR 694<br><br>Judge Manish S. Shah |

**MEMORANDUM OPINION AND ORDER**

Police officers recovered a gun from Dewuane Avriett's waistband and a grand jury charged him with being a felon in possession of a firearm. He now moves to suppress the gun, any evidence derived from the search of his person, and his post-arrest statements.

The parties agree that an evidentiary hearing is not necessary because most of the facts are not disputed and footage from the officers' body-worn cameras and a nearby security camera provide the other relevant facts. *See* [46] at 1; [47].[1] I draw inferences from the undisputed facts and the recordings.

Around 9:49 p.m. on May 16, 2019, about a dozen people gathered outside 6211 S. Wolcott Avenue in Chicago. Security camera footage from across the street shows a few people walking toward some cars that had just pulled up a few doors down. A person in that group fired shots from a gun and ran. The video shows a figure running past the house and turning onto 62nd Street. It is possible that this figure was the shooter, but even after multiple, frame by frame, viewings of the footage, I can't be

---

[1] Bracketed numbers refer to entries on the district court docket and page numbers refer to the CM/ECF header placed at the top of filings.

certain. The crowd dispersed in part; some people lingered outside while others retreated onto the property at 6211 S. Wolcott and out of frame. Officers later learned that some people went inside the house.

About three minutes after the shooting, police officers responded to the scene. At 63rd Street and Damen Avenue, officers found the driver of a black Jeep Cherokee bleeding from the chest. Another occupant of the Jeep told officers that they had been in front of 6217 S. Wolcott when they heard gunshots, drove away, and discovered that one of them had been shot.

CPD Officer Coyle noticed the security camera across the street, at 6218 S. Wolcott, and received permission to review the footage. Based on my review of the footage, I find that the officer genuinely and reasonably believed that someone complicit in the shooting was among the people who retreated onto the property at 6211 S. Wolcott after the shooting.

About an hour after the shooting, Officer Coyle and CPD Sergeant Candaleria knocked on the door of 6211 S. Wolcott. A woman answered and stepped outside. She said that she owned the house and that some people who had been standing outside during the shooting were now inside her home. Sergeant Candaleria told her that a video showed two people involved in the shooting running into her house. She said that she didn't think that was true and indicated that she and her family had nothing to do with the shooting. The sergeant said that detectives would likely be coming back to the house to investigate the shooting. The owner said that she would answer any

questions from the detectives, and they could come inside. The officers left without entering the house.

CPD Officers Rodriguez and Neven were on the scene in their marked squad car around 11:13 p.m., about ninety minutes after the shooting and thirty minutes after the sergeant spoke to the homeowner. Rodriguez and Neven saw a group of people leave the house at 6211 S. Wolcott and pile into two cars parked outside. The body-worn camera footage depicts the two officers getting into their car, driving a few car lengths along Wolcott, activating the emergency lights, and pulling up alongside and slightly in front of a white sedan stopped in front of 6211 S. Wolcott. The driver's window was down, and the rear passenger door was open. A person was clearly sitting on someone's lap in the back seat. Officer Rodriguez approached the driver and asked, "What are y'all doing? Y'all just chillin'?" The driver indicated that they were waiting to leave. Officer Rodriguez said, "You guys were all in that house and now all of a sudden you want to get [unintelligible]? Y'all gonna get out. You were in that house, too?" The driver replied, "I just got here." Officer Rodriguez ordered the driver to step out of the car, and the driver complied.

As Officer Rodriguez spoke to the driver, Officer Neven walked around to the passenger side of the white sedan and approached the open rear door. After Officer Rodriguez directed the driver to get out of the car, Officer Neven said, "Step out of the car." Defendant Avriett stepped out from the back seat through the open rear door.

Avriett shuffled toward the back of the car. Officer Neven's hands lightly brushed Avriett's sides as the officer said, "Hold on, hold on, hold on. You got anything on you, boss? Any weapons on you? Yes, no?" Avriett muttered affirmatively and the officer asked, "Huh? You got a weapon on you?" Officer Rodriguez then came around and said, "You got a weapon on you?" Officer Neven handcuffed Avriett and the officers found a gun in Avriett's front waistband. About sixty seconds elapsed between the time the officers approached the white sedan and when they found Avriett's gun.

About six minutes later, Officer Rodriguez told a supervising officer that as soon as Sergeant Candaleria left the scene, people came out of the house and started getting into cars, including the white sedan. Rodriguez said that the people in the sedan "were all on top of each other" and "we stopped them real quick." The supervising officer commented (or perhaps prompted) that Officers Rodriguez and Neven were acting on the information from the officers who saw the video, and Rodriguez said, "Yeah."

Avriett argues that the officers did not see the people getting into the cars because their body-worn camera footage does not depict it. But the chest-level camera positions and their focal lengths do not provide a perfect match to the officers' eyelines and visibility. The officers were only a few car lengths away, the house at 6211 S. Wolcott was already under scrutiny because security footage showed relevant activity at the house, and Officer Rodriguez credibly reported to a supervisor that people came out of the house after Sergeant Candaleria left the scene—information that she knew

4

because she saw it happen. At no point during the recording did anyone feed information to Officer Rodriguez about the group of people piling into cars.

That the driver told Officer Rodriguez that she had just arrived does not contradict or undermine my finding; the premise of Rodriguez's initial question was her observation that a group had been inside the house. There is no dispute that Avriett was inside the house when Sergeant Candaleria interviewed the homeowner and that Avriett was among the group of people that left the house and got into the white sedan. Sergeant Candaleria warned the homeowner that detectives would come back to the house, and the homeowner said she would let the detectives in. So it is not surprising that people would want to leave as soon as they thought the coast was clear after the sergeant's departure. The rear passenger door was still open when the police pulled up, so it is apparent from the footage that, consistent with the officers' reported observation, the group had just gotten into the car and was preparing to leave the scene.

The officers decided to approach the sedan because they believed that the occupants of the house had something to do with the shooting. The officers did not block the car's ability to leave, however, until they pulled up alongside it. By that time, the officers had seen a group getting into the car and had seen at least one person seated on the lap of another person in the back seat.

If the officers had just walked up to the car, there would have been no Fourth Amendment seizure until they ordered the occupants out of the car. *See United States v. Davis*, 50 Fed. App'x 313, 316–17 (7th Cir. 2002). But by activating their emergency

lights and pulling up alongside the sedan, the officers restrained the liberty of the driver and passengers through a show of authority, and the occupants submitted to that authority—it was a Fourth Amendment seizure. *United States v. Packer*, 15 F.3d 654, 657 (7th Cir. 1994); *see also United States v. Green*, 111 F.3d 515, 520 n.1 (7th Cir. 1997).

The approach was minimally intrusive, like a traffic stop. That type of detention does not offend the Fourth Amendment if supported by reasonable suspicion that the person stopped is engaged in or may be about to engage in unlawful activity. *See Rodriguez v. United States*, 575 U.S. 348, 354 (2015); *see also Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) (an officer who lacks probable cause but whose "observations lead him reasonably to suspect" that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to "investigate the circumstances that provoke suspicion") (quoting *United States v. Brignoni–Ponce*, 422 U.S. 873, 881 (1975)); *United States v. Miranda-Sotolongo*, 827 F.3d 663, 666 (7th Cir. 2016) (reasonable suspicion requires some particularized and objective basis for thinking that the person to be stopped is or may be about to engage in unlawful activity). Avriett argues that the officers lacked suspicion to seize him. The government argues that (1) the officers reasonably believed that a seatbelt violation was imminent and (2) they reasonably suspected some involvement in the shooting, and either of those suspicions supported an investigative seizure.

Even though the police reasonably believed that some occupants of the house had some complicity in the shooting, they did not have enough information to suspect Avriett (or the other occupants of the white sedan). Ninety minutes had elapsed, and not every person who was outside during the shooting or later emerged from the house could be suspected of involvement. The officers did not know enough to separate an innocent eyewitness from a suspect. "A mere suspicion of illegal activity at a particular place is not enough to transfer that suspicion to anyone who leaves that property." *United States v. Bohman*, 683 F.3d 861, 864 (7th Cir. 2012). Individualized suspicion as to the shooting was lacking for the occupants of the car and does not justify the seizure.[2]

But at least one occupant of the car was about to violate state law. Illinois requires each driver and passenger of a motor vehicle operated on a street to wear a properly adjusted and fastened seatbelt. 625 ILCS § 5/12-603.1(a). Although the white sedan was not in motion, the officers could be reasonably certain that it was about to leave the scene. There had been a shooting ninety minutes earlier, the police were around, and it was getting late. True, the street may have been blocked by other cars and police activity, so it may not have been clear how quickly the sedan would

---

[2] The government relies on *United States v. Williams*, 731 F.3d 678 (7th Cir. 2013), and *Torry v. City of Chicago*, 932 F.3d 579, 587–88 (7th Cir. 2019), but in those cases the officers detained suspects who presented a closer fit to the suspected offenders. Here, the security footage depicted a group of people, and some appear to be mere bystanders to the shooting. The officers could not reasonably suspect that everyone who emerged from the house on Wolcott had engaged in criminal activity related to the shooting. The officers could reasonably suspect that Avriett and the other occupants of the house had some information about the shooting, *see* footnote 3 below, but that is different than individualized suspicion that Avriett was complicit in it.

be able to leave. But there was no reason to stick around, especially in a parked car when someone had just been shot in a car on that block. It was reasonable to suspect that the car's occupants were going to leave as soon as they had the chance. Before any seizure, the officers saw two sets of people getting into two cars, and as the officers drove up to the white sedan, they could see the occupants "all on top of each other." They reasonably suspected that there were more people in the car than seatbelts, so a seatbelt would not be properly adjusted and fastened. I agree with Avriett that it is not clear from the body-camera footage that Avriett was sitting on someone's lap and thus that Avriett was about to commit a seatbelt violation. But that level of individualized suspicion was not necessary to detain the white sedan. It was enough to suspect that someone in the car (specifically, the person who was obviously seated on someone else's lap) was about to violate the law. A traffic violation was about to occur, and the Fourth Amendment does not prohibit a seizure based on that suspicion. *See United States v. McDonald*, 453 F.3d 958, 960 (7th Cir. 2006) ("[P]olice may conduct a brief, investigatory traffic stop if they have reasonable suspicion based on articulable facts that a crime is about to be or has been committed.").

The initial seizure of the sedan's occupants was valid, and so was ordering Avriett out of the car. "During a valid traffic stop, an officer may order the driver and passengers out of the vehicle without violating the Fourth Amendment." *United States v. Tinnie*, 629 F.3d 749, 751 (7th Cir. 2011). And although Avriett argues that the brushing of his sides as he moved toward the back of the car was an

unconstitutional frisk, that touching was of no consequence—it did not produce any evidence. The search of Avriett that produced evidence occurred after Avriett admitted that he was armed. He takes no issue with Officer Neven asking him if he had a weapon on him, and it was permissible to pose the question. An unsolved shooting had occurred, and Officer Neven was about to interact with a group of unknown people who had just left a house closely associated with the shooting. He could reasonably be concerned for his and other's safety and ask about weapons. *See United States v. Edwards*, 885 F.2d 377, 384 (7th Cir. 1989) (citing *New York v. Quarles*, 467 U.S. 649, 655–57 (1984)).

Once Avriett admitted that he was armed, the officers could frisk him. Less than a minute into the detention, it was within the scope of a seatbelt-violation stop to frisk someone who was suspected of being armed and dangerous. *Terry v. Ohio*, 392 U.S. 1, 27 (1968); *see Rodriguez*, 575 U.S. at 354 (*Terry* stop may last no longer than is necessary to effectuate its purpose). The people from the car were not yet restrained, there had been a shooting at the scene, and Avriett admitted that he had a weapon. A reasonably prudent officer in Neven's situation "would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27. The search that produced the gun was constitutional.

The seatbelt statute prohibits an officer from "search[ing] or inspect[ing]" a passenger "solely because of a violation of this Section." 625 ILCS § 5/12-603.1(f). But whether a search is reasonable under the Fourth Amendment "has never 'depend[ed] on the law of the particular State in which the search occurs.'" *Virginia v. Moore*, 553

9

U.S. 164, 172 (2008) (quoting *California v. Greenwood*, 486 U.S. 35 (1988)); *see also United States v. Simon*, 937 F.3d 820, 834 (7th Cir. 2019), *cert. denied*, 140 S. Ct. 824 (2020) ("Illinois law does not control the Fourth Amendment."). Moreover, the search here was not solely because of the seatbelt violation; the search occurred because Avriett said he had a weapon.

In sum, the motivation behind the officers' initial detention of Avriett (and the others in the car) was to investigate the shooting, although they did not have individualized suspicion of Avriett's involvement in it. Nevertheless, the officers had reasonable suspicion that someone in the car was about to commit a seatbelt violation; this justified the stop and the order to exit the car. Under the circumstances, it was appropriate to ask Avriett if he had a weapon, and once he admitted that he did, it was reasonable to frisk him. The gun and the evidence derived from it were the products of a constitutional search.[3]

---

[3] Alternatively, the initial seizure was reasonable under *Illinois v. Lidster*, 540 U.S. 419, 426–28 (2004), even without individualized suspicion of wrongdoing. Although this was not a highway checkpoint or roadblock, the detention of two groups of people leaving the scene of the shooting was like an information-seeking, minimally intrusive detention of potential witnesses. Officers reasonably believed that the occupants of the house had information about a shooting that had occurred about ninety minutes earlier. Catching the shooter while memories were fresh served a strong public interest, and investigating whether a group of people closely associated with the scene of the crime advanced that public interest with only a slight interference with their liberty as they sat in a stopped car on the street. *See Brown v. Texas*, 443 U.S. 47, 51 (1979) (considering the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty); *Maxwell v. County of San Diego*, 708 F.3d 1075, 1083 (9th Cir. 2013) ("[A]lthough detention of witnesses for investigative purposes can be reasonable in certain circumstances, such detentions must be minimally intrusive."); *Walker v. City of Orem*, 451 F.3d 1139, 1148 (10th Cir. 2006) (*Lidster* suggests that "a brief detention of witnesses is in fact permitted, provided that it meets the reasonableness test in *Brown*"); *see also Lincoln v. Scott*, 887 F.3d 190, 196–97 (5th Cir. 2018) (similar). A brief, albeit suspicionless detention of Avriett was reasonable, and asking limited questions for public safety was also appropriate under *Quarles*, 467 U.S. at 655–57. Then, once Avriett admitted

Defendant's motion to suppress [25] is denied.

ENTER:

Date:   November 20, 2020

_____
Manish S. Shah
United States District Judge

---

that he was armed, a frisk justifiably followed, leading to the constitutional recovery of the gun, Avriett's arrest, and his post-arrest statements.

11